UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION



| | | |
|---|---|---|
| In re: | ) | Case No. 15-16860 |
| | ) | |
| VLADO ZOVKIC, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Judge Pat E. Morgenstern-Clarren |
| | ) | |
| _____ | ) | |
| | ) | |
| NATIONAL CREDIT UNION | ) | Adversary Proceeding No. 16-1031 |
| ADMINISTRATION BOARD, ACTING | ) | |
| IN ITS CAPACITY AS LIQUIDATING | ) | |
| AGENT FOR ST. PAUL CROATIAN | ) | |
| FEDERAL CREDIT UNION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OF OPINION** |
| | ) | |
| VLADO ZOVKIC, | ) | |
| | ) | |
| Defendant. | ) | |

The plaintiff National Credit Union Administration Board is the liquidating agent for the
failed St. Paul Croatian Federal Credit Union. The Board filed this complaint seeking a
determination under Bankruptcy Code §§ 523(a)(2)(A) and (a)(2)(B) that a debt owed to St. Paul
by the defendant-debtor Vlado Zovkic is not dischargeable in his chapter 7 case. For the reasons
that follow, the Court finds that the Board did not meet its burden of proof and the debt is,
therefore, discharged.

## JURISDICTION

Jurisdiction exists under 28 U.S.C. § 1334 and General Order No. 2012-7 entered by the United States District Court for the Northern District of Ohio on April 4, 2012.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I), and it is within the Court's constitutional authority as analyzed by the United States Supreme Court in *Stern v. Marshall*, 564 U.S. 462 (2011) and its progeny.

## TRIAL

The National Credit Union Administration Board (Board) presented its case through the direct testimony of Kempe Hayes (a Board asset recovery analyst), Anthony Raguz (St. Paul's former chief operating officer),[1] Anna Soskic (the debtor's ex-wife), and cross-examination of the debtor, together with exhibits.[2]  The debtor presented his case through his own testimony, that of Michael Dosen (the debtor's accountant), and cross-examination of other witnesses.  The parties also stipulated to certain facts.[3]

The findings of fact are based on that evidence and reflect the Court's weighing of the evidence presented, including determining the credibility of the witnesses.  "In doing so, the Court considered the witness's demeanor, the substance of the testimony, and the context in which the statements were made, recognizing that a transcript does not convey tone, attitude,

---

[1] Raguz testified from the Federal Correction Institution-Elkton by live video/telephone by agreement of the parties.

[2] The Court has considered those exhibits that the parties connected to the testimony presented.

[3] Docket 50.

body language or nuance of expression." *In re The V Companies*, 274 B.R. 721, 726 (Bankr.

N.D. Ohio 2002). *See* FED. R. BANKR. P. 7052 (incorporating FED. R. CIV. P. 52).

## BANKRUPTCY CODE § 523(a)(2)(A) and § 523(a)(2)(B)

While an individual chapter 7 debtor is generally entitled to a discharge of most debts,

there are exceptions to that rule. The Board relies on two of them:

§ 523. Exceptions to discharge

　(a) A discharge under section 727 . . . of this title does not discharge an
individual debtor from any debt —

*　*　*

　　　(2) for money, property, services, or an extension, renewal, or
　　　refinancing of credit, to the extent obtained by—

　　　　　(A) false pretenses, a false representation, or actual
　　　　　fraud, other than a statement respecting the debtor's
　　　　　or an insider's financial condition; [or]

　　　　　(B) use of a statement in writing—

　　　　　　　(I) that is materially false;

　　　　　　　(ii) respecting the debtor's or an
　　　　　　　insider's financial condition;

　　　　　　　(iii) on which the creditor to whom
　　　　　　　the debtor is liable for such money,
　　　　　　　property, services or credit
　　　　　　　reasonably relied; and

　　　　　　　(iv) that the debtor caused to be
　　　　　　　made or published with intent to
　　　　　　　deceive . . . .

11 U.S.C. § 523(a)(2).

The exceptions are to be construed strictly against the creditor because a central purpose

of the Bankruptcy Code is to provide a fresh start to the honest but unfortunate debtor.

3

*Pazdzierz v. First Am. Title Ins. Co. (In re Pazdzierz)*, 718 F.3d 582, 586 (6th Cir. 2013). The creditor must prove its case by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

The two exceptions at issue here are mutually exclusive. "One [§ 523(a)(2)(A)] applies expressly when the debt follows a transfer of value or extension of credit induced by falsity or fraud (not going to financial condition), the other [§ 523(a)(2)(B)]when the debt follows a transfer or extension induced by a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied." *Field v. Mans*, 516 U.S. 59, 66 (1995).

There is a split in the case authority as to the proper interpretation of the phrase "other than a statement respecting the debtor's or an insider's financial condition" as required for § 523(a)(2)(A) to apply. This Court adopts the Sixth Circuit Bankruptcy Appellate Panel's strict interpretation of the phrase to mean "statements that are made regarding a debtor's overall net worth, assets and liabilities[.]" *Prim Capital Corp. v. May (In re May)*, 368 B.R. 85 at *7 (B.A.P. 6th Cir. 2007) (unpublished opinion). As the Panel stated in that decision:

> A broad interpretation simply brings too many statements under the rubric "concerning the debtor's financial condition," rendering the limitation meaningless. *See Joelson*, 427 F.3d 710-11.
>
> The operative terms in § 523(a)(2)(A), . . . , 'false pretenses, a false representation, or actual fraud,' carry the acquired meaning of terms of art. They are common-law terms, and, . . . , they imply elements that the common law has defined them to include.
>
> *Field v. Mann*, 516 U.S. 59, 69, 116 S.Ct. 437 (1995) (citations omitted). In fact, "if the phrase 'respecting the debtor's . . . financial condition' were given a broad reading, the resulting exclusion might eliminate coverage for many misrepresentations typical of the common-law torts that *Field* represents as lying at the heart of §[§] 523(a)(2)(A)." *Joelson*, 427 F.3d at 710 (citing

4

Field, 516 U.S. at 68-69 (explaining that § 523(a)(2)(A) refers mainly to common-law torts set forth in § 523(a)(2)(A)). A broad interpretation of the phrase "concerning the debtor's . . . financial condition" would allow debts incurred as a result of these common-law torts to be dischargeable. *Joelson*, 427 F.3d at 710. That result is not in line with the Court's analysis in *Field*. *See id.* at 710-11.

*Id.*

## THE POSITIONS OF THE PARTIES

There is no question but that St. Paul's chief operating officer Anthony Raguz and certain other St. Paul members committed financial crimes against St. Paul. The issue here is different: did the debtor commit civil fraud and/or other acts in his dealings with St. Paul such that the debt he owes is non-dischargeable in this bankruptcy case?

The Board argues yes, saying that over the course of years when the debtor borrowed money from St. Paul, he:

1.  obtained a mortgage construction loan in 1997 under false pretenses by telling St. Paul that it would have a first lien on property being used to build a house in Bratenahl when in fact another lender obtained a first lien [§ 523(a)(2)(A)];[4]

2.  engaged in a scheme with Raguz starting in 2003 to open St. Paul accounts in false names and use these accounts together with a corporate account and his then-wife's account to move loan balances around to evade review by St. Paul's examiners, while committing federal crimes [§ 523(a)(2)(A)];[5] and

3.  failed to disclose material information relating to his financial condition in loan applications starting in 2007 [§ 523(a)(2)(B)].[6]

---

[4] Closing brief at 2, docket 112.

[5] *Id.* at 3.

[6] *Id.* at 1.

5

The debtor denies that he committed any fraud or obtained money under false pretenses, and also denies that St. Paul, through Raguz, relied upon anything either stated in or omitted from the documents placed into evidence by the Board.

**FACTS**

**I. Background**

**A. St. Paul's Operations**

St. Paul Croatian Federal Credit Union (St. Paul), established in 1943 to serve members of Cleveland's St. Paul Croatian Parish, was a federally regulated and insured credit union that operated until April 30, 2010 when the Board stepped in to liquidate it due to a massive fraud perpetrated by Anthony Raguz.

As a federal credit union, St. Paul offered share accounts to customers who were referred to as members. A share account is the equivalent of a checking or savings account at a bank.[7] St. Paul had authority to make these kinds of loans: car, house, unsecured, and "share secured;" it did not have authority to make commercial loans.

The unsecured loans were limited to $5,000.00 per member. St. Paul could make share secured loans in higher amounts if they were secured dollar for dollar by funds pledged from a St. Paul account. Annually after year end, St. Paul's examiners set a limit for the amount that St. Paul could loan to any individual member, usually in the range of about $250,000.00 to $300,000.00. A loan balance exceeding that amount was termed a high concentration loan.

The only testimony about loan procedures came from Raguz, who had sole authority to make loans throughout his tenure as chief operating officer. He described the process he used in approving loans, as discussed below. There was no testimony about any loan committee, other

---

[7] Stips. 1-6.

6

officers, or about the procedures followed by St. Paul's examiners or auditors (other than with respect to the high concentration limit).

## B.  Raguz's Criminal Fraud

Raguz began his employment with St. Paul in 1989 as a teller, moving to operations manager in the mid-1990s and to chief operating officer in the early 2000s.  Starting in early 2001, Raguz conceived of and carried out a fraudulent scheme that had two parts.  First, he took bribes from members (not including the debtor) in exchange for "covering bad loans," which he defined as making a commercial loan that appeared on paper to be share secured by a member's account, when it was not.  And second, Raguz opened new accounts to conceal the loans when they were 90 days delinquent or the loan violated the high concentration limit because either event would draw attention from the examiners.  To avoid detection, he "re-set" those loans.  He did this by splitting an account with a high balance into two accounts so that each one would be in an amount lower than the applicable high concentration limit or to take the first loan off of the delinquent list by making it appear that the first loan was paid.

To create the second account, Raguz either asked the borrower to have someone open a second account or he just independently opened one in a fictitious name.  Account statements went out quarterly on those accounts just as they did with legitimate accounts.

Raguz carried on with this scheme for about nine years, due at least in part to the unsophisticated nature of the examiners' review.  Later, with the advent of computers, the examiners began to cross-check addresses and other information; that, plus the fact that Raguz was making larger and larger loans to members, made it harder and then–by April 2010–impossible for Raguz to conceal his fraud.

7

Raguz testified, and the Court finds, that the debtor was not part of this fraudulent scheme; to the contrary, Raguz considered the loans made to the debtor to be legitimate transactions that the debtor failed to repay. The debtor has not been charged with a crime in connection with Raguz's scheme.

## II. The Debtor's St. Paul Transactions

### A. The Debtor's Business Activity: ZMS and Building the Bratenahl House

The debtor, born in Croatia, is a trained engineer who arrived in the United States in 1985 at the age of 25. He opened a share account in the late 1980s. For three years, he worked as a skilled machinist for others; during this time he saved money and, with a loan from St. Paul, bought a house in Mentor and then another house in Willoughby.

In 1990, the debtor started ZMS Hi-Tech Machining Co., Inc. as the sole shareholder and officer. The work was essentially what he had been doing since arriving in the U.S.: he would receive a customer order for a hydraulic part, review the prints for the part needed, and program the computer to manufacture the part using materials supplied by the customer. His biggest customer was Eastlake Manufacturing. In the 1990s, the debtor worked almost 24 hours a day, seven days a week, employed 9-10 people, and made a "very good income." It was during this time that he began the process of buying land for and then building a house in Bratenahl of his own design.

The debtor's financial trouble began after September 11, 2001 when he and other machinists in this area started losing work. The debtor went back to doing all the work himself. Business got worse in 2008 and 2009 when Eastlake Manufacturing significantly reduced the number of its employees and brought all of its business in-house. The debtor had little or no

8

machining work in the following years. He did, though, continue to work on construction of the Bratenahl house.

The facts surrounding the debtor's income from 2000 to 2010 are incomplete. His individual federal income tax returns show this: 2005–$25,000.00; 2007–$26,000.00; 2008–$10,000.00; and 2009–$0. The debtor, however, was the sole owner of ZMS, an S corporation, meaning that the ZMS income flowed through to him for tax purposes. The parties did not establish the amount of that income. The debtor testified that in the last three years he had $50,000.00 income one year and no income the other two. The only bills he now pays are for electricity and gas, and his family helps him with those.

## B. The Amount of the Debt

In 1995, the debtor bought a vacant lot in Bratenahl intending to build a house. He soon determined that the lot would not be big enough for his plans and he bought two additional adjacent lots.[8]

The debtor began to build in July 1996, apparently funded at least in part by a $690,000.00 construction loan from Metropolitan Bank.[9] In 1997, St. Paul made a $150,000.00 loan for the project[10] followed by multiple other loans or refinancings over a period of about 13 years. The debtor's plans called for a 16,000 square foot house, including 12,000 square feet of

---

[8] There was no testimony as to the amount paid by the debtor for any lot nor was it established which entity loaned the debtor the money to buy the lots. In any event, he testified he paid those loans in full before he started to build.

[9] Debtor's testimony. Metropolitan merged into Sky which in turn merged into Huntington, which still holds and/or owns a note secured by a mortgage. The mortgage is discussed further below.

[10] Debtor's testimony.

9

living space.  Raguz, who saw it twice, described it as "the finest house in Cleveland" built with the best materials.  The house is now valued for real estate tax purposes at $2.2 million.

According to St. Paul's books and records, the debtor owes $4,521,589.08 as of April 30, 2010.[11]  This is principally made up of loans connected to building the Bratenahl house, but it also includes loans obtained to satisfy tax obligations and to finalize his divorce.  The debtor has not made significant payments on any of the St. Paul loans.[12]  The parties agree that the loans are secured by a second mortgage in favor of St. Paul.  While the debtor held St. Paul to its burden of proof at trial, ultimately he did not challenge the amount of the debt.

The debtor worked on the Bratenahl house for about eight years, both individually and with contractors, trying to finish it slowly as he had the time and money.  As noted, by the time the Board took over St. Paul's, the debtor owed more than $4 million.  The only explanation Raguz provided for why he continued to approve the debtor's loan requests was this:  "What was I going to do with half a house?"  Taking this in context, the Court finds that by this Raguz meant that if he did not keep making loans, the debtor would not have enough funds to finish the house on which St. Paul had a second mortgage, thus quashing any hope St. Paul had of being repaid through a sale of the completed project.

### C.  The Process Through Which the Debtor Borrowed Money from St. Paul's

Both the debtor and Raguz testified without contradiction (and the Court finds credible) that Raguz followed the same procedure for loaning money to the debtor as Raguz did for any

---

[11]  The Board proved this amount using the *D'Oench Duhme* doctrine. *See D'Oench, Duhme & Co. v. Fed. Deposit Ins. Corp.*, 315 U.S. 447 (1942) and 12 U.S.C. § 1787(p)(2).

[12]  The debtor did make a few small payments on a few accounts.  *See, for example,* exhibit 13-9 showing payments on account #82160-65.

member who wanted to borrow $10,000.00 or more (apart from those members involved in Raguz's criminal fraud). The debtor would simply call Raguz and tell him the amount needed and to whom the checks should be payable.[13] Raguz would say: "Come on in and get it; the check(s) will be waiting."

When the debtor arrived at St. Paul's, the checks would be at a teller window. He would sign whatever paperwork Raguz left for him without reading it and take the checks. Raguz did not ask the debtor for any financial statements, tax returns or any other information for or in connection with the loan documents, nor did the debtor provide any.

The debtor and Raguz occasionally had conversations (on unspecified dates) in which they would discuss the debtor's business. Raguz would ask "What's going on? What's happening? How will we get paid?" When the machining business was down, the debtor was generally optimistic that it would improve. Raguz was familiar with that industry's ups and downs because he had other members who were machinists. When the debtor had work, according to Raguz, he worked hard and had high profit margins.

St. Paul sent the debtor quarterly statements which he received but did not open. At year end, his accountant Michael Dosen would contact St. Paul for the information needed for the debtor's tax returns. Raguz testified (and the Court finds credible) that, for various reasons, "a lot" of St. Paul's customers did not open their statements. In the debtor's case, Raguz "chalked it up to ego." The debtor summed up their relationship by saying that "he trusted Tony, and

---

[13] It was standard practice for a member to have St. Paul provide an Official Check. The checks were for the most part made out to contractors, material suppliers, taxing authorities, and the debtor's ex-wife and her attorney.

Tony trusted him." This is consistent with their testimony that the Cleveland Croatian

community is small and close-knit.

Additional facts are set forth in connection with the Law and Discussion.

## LAW AND DISCUSSION

### I. The Elements of 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) requires proof that:

> (1) the debtor obtained money through a material
> misrepresentation that, at the time, the debtor knew was false or
> made with gross recklessness as to its truth; (2) the debtor intended
> to deceive the creditor; (3) the creditor justifiably relied on the
> false representation; and (4) its reliance was the proximate cause of
> loss.

*Rembert v. AT&T Universal Card. Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir.

1998) (footnote omitted). A material omission may constitute a misrepresentation under

§ 523(a)(2)(A). *First Horizon Home Loan Corp. v. Apostle (In re Apostle)*, 467 B.R. 433, 440

(Bankr. W.D. Mich. 2012). And as the United States Supreme Court held recently, the phrase

actual fraud in § 523(a)(2)(A) is not limited to misleading misrepresentations and omissions, but

rather encompasses a debtor's engagement in a fraudulent scheme to deprive another of property

or a legal right. *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1590 (2016); *see also Mellon

Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001).

A misrepresentation is material if it contains substantial inaccuracies of the type that

would generally affect a lender's or guarantor's decision. *Jenkins v. Schmank (In re Schmank)*,

535 B.R. 243, 257 (Bankr. E.D. Tenn. 2015). The standard for intent under § 523(a)(2)(A) is

that the debtor must either have intended to deceive or acted with gross recklessness. *Martin v.

Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1167 (6th Cir. 1985). As direct proof is

12

seldom available, fraudulent intent may be shown by the totality of the circumstances of a case. *See Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 686 (6th Cir. 2000) (noting that courts may deduce fraudulent intent from all the facts and circumstances of a case); *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999) (stating that a debtor's intent may be inferred from circumstantial evidence or from a debtor's course of conduct.). Whether a debtor acted with gross recklessness should "focus on whether the surrounding circumstances or the debtor's actions appear so inconsistent with [his] self-serving statement that [he] lacked intent that the proof leads the court to disbelieve the debtor." *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 787 (Bankr. E.D. Tenn. 2003) (internal quotation marks and citation omitted).

As to reliance, § 523(a)(2)(A) requires proof of actual reliance and that reliance was justifiable. *Field v. Mans*, 516 U.S. at 68. The justifiable reliance standard does not impose a duty to investigate to discover fraud or the truth of a representation. *Kraus Anderson Cap., Inc. v. Bradley (In re Bradley)*, 507 B.R. 192, 206 (B.A.P. 6th Cir. 2014). Instead, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than the application of a community standard of conduct to all cases." *Field v. Mans*, 516 U.S. at 70-71 (quotation marks and citation omitted). Therefore, "'it is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which would serve as a warning that he is being deceived, that he is required to make an investigation of his own.'" *Id.* at 71 (quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971)).

## II. The Elements of 11 U.S.C. § 523(a)(2)(B)

To establish that a debt is nondischargeable under § 523(a)(2)(B), the creditor must prove that the debtor sought 'money, property, services, or an extension, renewal or refinancing of

13

credit' by use of a writing (1) 'that is materially false;' (2) concerning 'the debtor's . . . financial condition;' (3) 'on which the creditor . . . reasonably relied; and' (4) 'that the debtor caused to be made or published with intent to deceive . . . .'" *Oster v. Clarkston State Bank (In re Oster)*, 474 Fed. App'x 422, 425 (6th Cir. 2012) (unpublished opinion) (quoting 11 U.S.C. § 523(a)(2)(B)).

A "materially false" financial statement is "one that paints a substantially inaccurate picture of a debtor's financial condition by misrepresenting information of the type which normally would affect the decision to grant credit." *Midwest Comm. Fed. Credit Union v. Sharp (In re Sharp)*, 357 B.R. 760, 765 (Bankr. N.D. Ohio 2007); *see also In re Bogstad,* 779 F.2d 370, 375 (7th Cir. 1985) ("A recurring guidepost used by courts [for determining material falsity] has been to examine whether the lender would have made the loan had he known of the debtor's true financial condition.").

In contrast to § 523(a)(2)(A), § 523(a)(2)(B) requires proof that the creditor actually relied on the material misrepresentations and that the reliance was reasonable, which is a higher standard than justifiable reliance. *Oster,* 474 Fed. App'x at 425. Whether a creditor's reliance was reasonable is generally determined in light of the totality of the circumstances. *Bank One Lexington, N.A. v. Woolum (In re Woolum)*, 979 F.2d 71, 75 (6th Cir. 1992). However, "the reasonableness requirement of § 523(a)(2)(B) 'cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith.'" *Id.* at 76 (quoting *Martin*, 761 F.2d at 1166). The Sixth Circuit considers these factors in analyzing the reasonableness of a creditor's reliance:

> (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether

14

even minimal investigation would have revealed the inaccuracy of
the debtor's representations.

*In re Oster*, 474 Fed. App'x at 425 (citing *BancBoston Mortg. Corp. v. Ledford (In re Ledford)*,

970 F.2d 1556, 1560 (6th Cir. 1992)).  Again, the debtor must have intended to deceive or acted

with gross recklessness.  *Martin*, 761 F.2d at 1167.

### III.   Reliance Legal Issues Under Both §§ 523(a)(2)(A) and 523(a)(2)(B)

#### A.  *D'Oench Duhme*

In a pretrial motion and again in its closing brief, the Board argues that it is not required

to prove reliance under either section because that element is satisfied as a matter of law under

the *D'Oench Duhme* doctrine.  *See D'Oench, Duhme & Co. v. Fed. Deposit Ins. Corp.*, 315 U.S.

447 (1942) and 12 U.S.C. § 1787(p)(2).  As this Court previously explained:[14]

> The *D'Oench Duhme* doctrine as applied to liquidation of credit
> unions has its origins in both common law, *D'Oench, Duhme &
> Co. v. Federal Deposit Ins. Corp*, 315 U.S. 447 (1942), and statute,
> 12 U.S.C. § 1787(p)(2).  In the case that gave its name to the
> common law doctrine, the Supreme Court held that when the FDIC
> acquired certain notes that secured a now-failed lender's obligation
> to the FDIC, the borrower could not defend against collection on
> the notes by arguing a side agreement existed with the lender not
> to enforce the notes.  Later, the Supreme Court would explain that
> the purpose of the doctrine is to ensure that an examiner can rely
> on the books and records of the failed institution, to make sure that
> senior board officers examine unusual transactions, and to prevent
> bank employees from fraudulently colluding to insert new terms
> into agreements when the lender is on the verge of failing.
> *Langley v. Fed. Deposit Ins. Corp*, 484 U.S. 86, 91-92 (1987); *see
> also Abrams v. Fed. Deposit Ins. Corp.*, 944 F.2d 307, 310 (6th
> Cir. 1991).

Consistent with that concept, Congress enacted 12 U.S.C. § 1787(p)(2) which states in part that:

---

[14]   *See* Order Partially Granting Motions in Limine, docket 99.

(2) No agreement which tends to diminish or defeat the right, title, or interest of the Board[15] in any asset acquired by it under this subsection, either as security for a loan or by purchase, shall be valid against the Board unless such agreement–

    (A) shall be in writing;

    (B) shall have been executed by the credit union and the person . . . claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the credit union;

    (C) shall have been approved by the board of directors of the credit union, which approval shall be reflected in the minutes of such board; and

    (D) shall have been, continuously from the time of its execution, an official record of the credit union.

12 U.S.C. § 1787(p)(2).

While this Court upheld the Board's right to prove the amount of the debt using this doctrine in connection with a motion in limine, it declined to stretch the doctrine to the point where it excused the Board from proving the reliance element of § 523, a holding that it now reaffirms.

The cases cited by the Board to excuse it from proving that it relied on any representation made by the debtor do not support its position under the facts of this case. For example, in *Yarbrow v. FDIC*, the court limited its ruling to the situation where the debtor and the lender acted jointly with the intent to defraud either the banking examiners or the FDIC which, as discussed below, is not the case here. *Yarbrow v. Fed. Deposit Ins. Corp.(In re Yarbrow)*, 150 B.R. 233, 239 (B.A.P. 9th Cir. 1993).

---

[15] The term Board means the National Credit Union Administration Board. 12 U.S.C. § 1752(4).

Additionally, the better line of reasoning on this issue does not relieve the Board from proving reliance. *See Fed. Deposit Ins. Corp. v. Smith (In re Smith)*, 133 B.R. 800, 810 (N.D. Tx. 1991) (declining to apply the doctrine to excuse the FDIC as receiver from proving reliance under 11 U.S.C. § 523(a)(2)(A)); *Fed. Deposit Ins. Corp. v. Rotman (In re Rotman)*, 133 B.R. 843 (S.D. Tex. 1991) (concluding that issues of dischargeability under § 523(a)(2)(B) are beyond the scope of the doctrine); *see also Resolution Trust Corp. v. Hilton*, 182 B.R. 483 (S.D. Miss. 1995) (holding that *D'Oench, Duhme* cannot be used to satisfy the § 523(a)(2)(B) reliance requirement absent evidence of collusion or an agreement between the debtor and the bank).

The Board must, therefore, prove that St. Paul relied on the debtor's material misrepresentations of fact as part of its case in chief on both counts.

## B. Rogue Agents Under Ohio Law

To the extent that the evidence proves that Raguz knew the facts underlying the debtor's representations and omissions (thus negating reliance by Raguz), the Board argues that Raguz's knowledge cannot be imputed to St. Paul under Ohio law because he was acting as a rogue agent.

Under Ohio law, "[a] principal is generally charged with the knowledge of and conduct undertaken by its agent operating within the scope of his employment." *Bash v. Textron Fin. Corp. (In re Fair Fin. Co.)*, 834 F.3d 651, 676 (6th Cir. 2016) (citing *First Nat'l Bank of New Bremen v. Burns*, 103 N.E. 93, 94 (Ohio 1913)). The general rule is, however, subject to the adverse interest exception cited by the Board. Under that exception, an agent's "knowledge and conduct . . . will not be imputed to a principal if its agent 'is engaged in committing an independent fraudulent act on his own account, and the facts to be imputed relate to this fraudulent act.'" *Id.* at 676-77 (quoting *Am Exp. & Inland Coal Corp. v. Matthew Addy Co.*, 147 N.E. 89, 92 (Ohio 1925)). "In such cases the presumption is that the agent will conceal any fact

17

which might be detrimental to his own interest." *First Nat'l Bank of New Bremen*, 103 N.E. at

94. Courts typically find that "an agent who uses his office to loot corporate assets has acted

adversely to his principal." *The Unencumbered Assets Trust v. JP Morgan Chase Bank (In re*

*Nat'l Century Fin. Enters., Inc.)*, 783 F. Supp.2d 1003, 1016 (S.D. Ohio 2011).

This exception to the general agency rule is, itself, subject to an exception known as the

sole actor doctrine:

> Pursuant to the sole actor doctrine, if the agents responsible for the
> adverse conduct are the officers or directors of the principal and
> those officers or directors "so dominated and controlled the
> [principal] that the [principal] had no separate mind, will, or
> existence of its own," then the officers and directors are deemed
> the "alter egos" of the principal and "any malfeasance on their
> parts is directly attributable to the [principal]."

*Bash v. Textron Fin. Corp.*, 834 F.3d at 677 (quoting *Terlecky v. Hurd (In re Dublin Secs., Inc.)*,

133 F.3d 377, 380 (6th Cir. 1997)); *see also Anderson v. Gen. Am. Life Ins. Co.*, 141 F.2d 898,

908 (6th Cir. 1944) (stating that the sole actor doctrine, "is an exception to the exception of non-

imputability to the principal of the agent's knowledge, [and] applies where an officer, though

acting for himself or a third person, is the sole representative of the corporation in the transaction

in question."). The Ohio Supreme Court has characterized this doctrine as asking whether the

principal and agent are "alter egos." *See First Nat'l Bank of New Bremen*, 103 N.E. at 95 (where

an agent is the alter ego of the principal, "his acts and knowledge ipso facto become the

knowledge and acts of the principal").

The evidence proved that the sole actor doctrine applies and Raguz's knowledge

regarding the debtor's loan transactions must be imputed to St. Paul and by extension to the

Board as its liquidator. Here, St. Paul was the principal and Raguz, chief operating officer, was

its agent. While Raguz acted fraudulently in that role and in a manner adverse to St. Paul in the

transactions with the debtor, the evidence firmly established that Raguz was authorized by St. Paul to make the loans and that no individual or group of individuals needed to act in any way before Raguz made the lending decision. In essence, St. Paul acted as a one-person operation when making loans, as a result of which Raguz's knowledge regarding the transactions is imputed to St. Paul.

### IV. The § 523(a)(2)(A) Claims

### A. The First Mortgage Issue

St. Paul argues:

> In 1997, Debtor obtained a mortgage loan from St. Paul under false pretenses. Debtor advised St. Paul that it would have a first mortgage on his Bratenahl mansion (and the same was reflected as a first mortgage in St. Paul's books and records), however, Debtor did not disclose he was obtaining a construction loan from Metropolitan Bank–which recorded its mortgage first.[16]

St. Paul did not prove that the debtor made a material misrepresentation with respect to whether St. Paul would have a first mortgage in connection with a 1997 loan or that St. Paul relied on anything the debtor said.

The first hurdle is proof that St. Paul made a loan in 1997 that was secured by a mortgage. St. Paul did not introduce into evidence any primary loan documents relating to a 1997 loan, whether secured by a mortgage or not. The only mortgages in evidence are not from St. Paul's records but are instead from documents subpoened from Huntington, the ultimate successor to Metropolitan Bank. These are the two mortgages from Huntington's file:

1.  A mortgage given by the debtor to St. Paul dated September 26, 1995 and recorded the same date on "S/L #7 in Colony at Bratenahl" to secure a loan in the amount of $124,000.00,[17] with a

---

[16] Closing Brief at 2-3, docket 112.

[17] Exhibit 17-4 to 17-5.

19

St. Paul acknowledgment dated March 26, 1997 releasing the mortgage because it had been "satisfied and discharged;" and

2. A mortgage given by the debtor to St. Paul dated March 28, 1996 but not recorded until April 26, 1996 on property located at "S/L #5 and #6 Colony Lane and Bingham Court. Bratenahl" to secure a loan in the amount of $124,000.00.[18]

The September 1995 mortgage cannot be the basis for the Board's claim both because it predates the claim and also because St. Paul released it. The same timing problem exists with respect to the March 1996 mortgage.

The debtor testified that he got a $150,000.00 St. Paul loan in 1997. The evidence on the first mortgage claim came from Raguz's testimony. Looking at the debtor's St. Paul statement for the third quarter of 2002, he identified six accounts in the debtor's name including account #82160-72 which has the words: "Type [of loan] 1st mortgage." Raguz testified he believed St. Paul had a first mortgage on the Bratenahl property based on what the debtor said but in reality St. Paul "ended up behind Metro[politan] Bank." He also said there was a "filing issue" and the mortgage "was filed behind Metro[politan]." There was no testimony as to the date on which they had this conversation, what exactly was said or when Metropolitan filed a mortgage and what debt amount it secured. And Raguz acknowledged that the St. Paul "money was already out the door" when he found out St. Paul had a second mortgage so "you gotta take what you get."

_____

[18] Exhibit 17-6 to 17-9. The Board did not present testimony to explain most of the documents in this exhibit. Absent that testimony, the Court considers the only relevant documents to be the mortgages referenced by the debtor and Raguz. The *D'Oench Duhme* doctrine is not available to help the Board with this issue because that applies to documents found *in the credit union's files*, and these documents are from Huntington's files.

20

This is far too vague to establish that the debtor made a misrepresentation, much less a material one made with the intent to deceive St. Paul into loaning money in connection with a 1997 loan. The fact that the words "1st mortg" appear on a 2002 quarterly statement is an administrative act that does not prove the debtor fraudulently promised St. Paul a first mortgage on the Bratenahl property seven years earlier. Further, even if one looks to the 1996 mortgage as the source of this claim, St. Paul did not record it until more than a month after the debtor signed it, making it more likely than not that St. Paul itself created whatever filing problem it experienced.

Finally it bears noting that Raguz continued to approve loans to the debtor for years knowing that St. Paul did not have a first mortgage. Raguz could not have been relying on this alleged misrepresentation after he learned that St. Paul did not have a first mortgage on the Bratenahl property, and he did not claim to have so relied.

For those reasons, St. Paul did not meet its burden of proof on this claim.

### B. The Fictitious Accounts

The Board contends in its second argument under § 523(a)(2)(A) that the debtor actively participated in or lent himself to a fraud with Raguz by working with him to open accounts in fictitious names, opening a corporate account in ZMS's name, and encouraging his then-wife to open an account that could be used to re-set some of the debtor's loans and fund the Bratenahl construction, all to avoid detection by the examiners.

Raguz certainly knew about all of these accounts and that some or all of them were opened to re-set loans to conceal his fraud. The factual dispute is whether the debtor also knew about them and how they were used, thus actively participating in a fraud with Raguz.

### 1. The Debtor's Undisputed Accounts

There is no dispute over the fact that the debtor had these four accounts:

1.  A share account opened by the debtor in the late 1980s.[19]  There are no documents in evidence relating to the opening of this account.

2.  An IRA account dating from at least 1996 with a balance in the $2,000.00 range.[20]  There are no documents in evidence relating to the opening of this account.

3.  An account relating to a home purchased by the debtor in Mentor with funds borrowed from St. Paul.  There is no loan application or other contemporaneous documentation in evidence relating to the opening of this account.

4.  An account relating to a home purchased by the debtor in Willoughby.  There is no loan application or other contemporaneous documentation in evidence relating to the opening of this account.

St. Paul does not claim that these accounts were involved in the fraudulent scheme.

### 2. The Disputed Accounts

#### a. The Share Account Opened by Anna Soskic During Her Marriage to the Debtor

#### (Account # 70400-55)

In 2002, Raguz asked the debtor to have someone open an account and the debtor asked his then-wife Anna Soskic to do so.  While she opened a share account, she did not apply for any loan from St. Paul.  Nevertheless, St. Paul's records include a loan application dated March 13, 3003 [sic][21] bearing the misspelled name "Ana Soskic" applying for a loan in the amount of

---

[19]  The earliest account statement in evidence for this account #82160-00 is for the quarter ending June 1996.  Exhibit 13-1.

[20]  The earliest account statement in evidence for this account #82160-20 is for the quarter ending June 1996.  Exhibit 13-1.

[21]  Exhibit 27-1 to 27-2.  This is a typographical error and should read "2003."

$303,091.92. The application lists a birth date, home phone number, Social Security number, and bears a signature, but the areas for income, assets, and liabilities are blank. Raguz signed it on page 2 under the section titled "approved by loan officer."

A promissory note with a signature for Anna Soskic in account "07040000-55" dated March 13, 2003[22] for $303,091.92 states that it is "signature and share secured by 00217021, 20, 23." There is no evidence as to the members whose accounts supposedly secure this debt. The witness name is not the debtor's.

The evidence established that Anna Soskic did not sign this application or note. The Court believes the debtor's testimony that he did not sign the documents either, a denial that has teeth because he presumably would have spelled his then-wife's name correctly, Raguz testified he had no idea who signed the documents, and there was no evidence to connect the debtor to the signature. The Court finds it is more likely than not that someone at St. Paul signed Soskic's name to the documents in order to open an account that could be used by Raguz to re-set some of the debtor's outstanding obligations and to provide the construction funds requested by the debtor to pay contractors working on the Bratenahl house. There was no credible evidence that the debtor knew when he asked his wife to open an account that Raguz would then apply for a fraudulent loan and use it to re-set monies loaned to the debtor as part of his scheme to avoid detection by the examiners. In fact, there was no evidence that the debtor even knew that St. Paul had examiners or what role they played in the financial life of St. Paul.

---

[22] Exhibit 27-4.

**b. The Share Account in the name of ZMS**

**(Account #82180)**

There are account statements in the name ZMS starting with the quarter ending December 31, 2003, and the debtor acknowledged the account was opened to reduce high loan balances in other accounts. Again, though, the evidence did not support the Board's contention that the debtor opened this account and shifted loan balances from his other accounts to obtain more loans, all with the intent to deceive St. Paul.[23]

**c. The Share Account in the Name of Marko Zlokic**

**(Account # 82280)**

Raguz opened account #82280 during the quarter ending March 31, 2005 in the name of Marko Zlokic.[24] Raguz testified (and the Court finds credible) that he opened this account with a fake name to de-concentrate one of the debtor's accounts and meet a request from the debtor for additional funds. There was no credible evidence that the debtor knew about Raguz's actions or agreed to the loan re-setting to deceive St. Paul.

At year end when CPA Dosen requested tax documents from St. Paul, Raguz put the account in the debtor's name before sending the documents.

**d. The Share Account in the Name of Danica Vrbic**

**(Account #77650)**

Raguz opened account #77650 in the fictitious name of Danica Vrbic during the quarter ending March 31, 2005.[25] Raguz testified (and the Court finds credible) that he did so because

---

[23] Closing Brief at 3, docket 112.

[24] Exhibit 3-1.

[25] Exhibit 1-1.

the auditors were coming and he had to de-concentrate the debtor's loans. He split the debtor's loans and put some of the debt into this new account. There was no credible evidence that the debtor knew about Raguz's actions or agreed to the re-setting to deceive St. Paul.

At year end when Dosen requested tax documents from St. Paul, Raguz put the account in the debtor's name before sending the documents.

### e. The Share Account in the Name of Zeljko Mozic

### (Account #48210)

Raguz opened account #48210 in the fictitious name of Zeljko Mozic during the quarter ending March 2005 to de-concentrate the debtor's loans and provide him with construction funds.[26] Raguz testified (and the Court finds credible) that he opened this fictitious account to de-concentrate the debtor's loans. There was no credible evidence that the debtor knew about Raguz's actions or agreed to the re-setting to deceive St. Paul.

At year end when Dosen requested tax documents from St. Paul, Raguz put the account in the debtor's name before sending the documents.

### f. The Share Account in the Name of Marijana Schwabo

### (Account #67570)

Raguz opened account #67570 in the name of Marijana Schwabo during the quarter ending March 31, 2005.[27] Raguz testified (and the Court finds credible) that he opened this account in a fictitious name to de-concentrate the debtor's loans. There was no credible evidence that the debtor knew about Raguz's actions or agreed to the re-setting to deceive St. Paul.

---

[26] Exhibit 5-1.

[27] Exhibit 11-1.

At year end when Dosen requested tax documents from St. Paul, Raguz put the account in the debtor's name before sending the documents.

*    *    *

Raguz testified that the debtor would have been aware of these four fictitious accounts and the loans made in Anna Soskic's and ZMS's accounts if he had opened his quarterly statements. The evidence was, however, to the contrary: the debtor, like many of his fellow St. Paul members, did not open his statements. Morever, there was no testimony to support the argument that the debtor knew the six accounts were being used to re-set his loans for the purpose of avoiding detection from the examiners. The debtor denied participating in any re-set or even knowing what the term meant, and Raguz's testimony supported that denial. The evidence established that Raguz took these actions to cover his own bad lending decision and later to cover his own additional crimes committed against St. Paul.

The Board did not, therefore, prove this claim under § 523(a)(2)(A).

## V. The § 523(a)(2)(B) Claim

St. Paul claims that the debtor made material misrepresentations of fact about his financial condition in loan applications he signed over the years, that he did so with the intent to deceive St. Paul, and that St. Paul relied on them. Specifically, St. Paul contends that the debtor failed to list judgment debts, car lease payments, tax debts, and a foreclosure action, as well as falsely saying that his income was not likely to decline in the two years following the application dates. The Board also argues that the debtor deceived it while committing federal crimes and assisting Raguz in covering up his own crimes.

26

**A.**

**1. The Loan Applications**

Although St. Paul started to loan money to the debtor in about 1995, the loan applications

in evidence are dated 2007-2009, together with undated applications. They are:

1. Loan Application Dated September 7, 2007[28]
   This application for a loan in the amount of $320,375.10 is signed
   and dated by the debtor and approved by a loan officer whose
   name is illegible. The application has this information typed in on
   page one: the debtor's name, address, birth date, social security
   number, marital status, and employment income as a machinist
   listed as $5,000.00 a month from ZMS.

   Page two includes this information:

| WHAT YOU OWE | Creditor Name other than this credit union | Present Balance | Monthly Payment |
|---|---|---|---|
| closed end | St. Paul Croatian FCU #50[29] | $295,542.41 | $2,200.13 |

| WHAT YOU OWN | Property location | Market value |
|---|---|---|
| share account 07765000 | main share | 10.59 |

   Additionally, under "Other Information About You," the
   application has a typed X indicating "No" next to these questions:

   \*     \*     \*

2. Do you currently have any outstanding judgments
   or have you ever filed for bankruptcy, had a debt
   adjustment plan confirmed under chapter 13, had
   property foreclosed upon or repossessed in the last
   7 years, or been a party in a lawsuit?

---

[28] Exhibit 29-1 to 29-2.

[29] It is not clear why this information appears in the space because #50 *is* this credit
union.

3.      Is your income likely to decline in the next two years?

This typed information appears under the section "Signatures":

You understand that [St. Paul's] will rely on the information in this application and your credit report to make its decision.

\*      \*      \*

 It is a federal crime to willfully and deliberately provide incomplete or incorrect information on loan applications made to federal credit unions . . . .

2.      "Loan and Security Agreements and Disclosure Statement"[30] dated September 7, 2007 signed by the debtor with a typed rate, date, account and loan number 04821053, group policy number, maturity date, truth in lending disclosures, and itemization of the amount financed showing $60,000.00 "given to you directly" and $260,375.00 "amount paid to your account."

The section for "Security" is blank.

3.      Loanliner Application undated,[31] signed by the debtor with a typed amount requested ($30,000.00), name, account number, social security number, birth date, address, and marital status. The "Employment/Income" section is blank.

This is typed on page two:

| WHAT YOU OWE | Creditor Name other than this credit union | present balance | monthly pymt |
|---|---|---|---|
| closed end | St. Paul Croatian FCU #50 | $298,692.52 | $2,193.65 |

| WHAT YOU OWN | Property location | Market value |
|---|---|---|
| share account 07765000 | main share | 10.66 |

---

[30] Exhibit 29-3 to 29-6.

[31] Exhibit 33-10 to 33-12. The St. Paul Official Check issued in connection with this application is dated December 6, 2007.

28

The "Other Information" is the same as above, as is the information below "Signatures".

The "Federal Credit Union Use Only" section is dated 12/6/07 but is not signed and the "approved/dated" section is blank.

4.   Loanliner Application[32] undated, signed by the debtor with typed name, account number, social security number, birth date, address, and marital status.  The "Employment/Income" section is blank.

This is typed on page 2:

| WHAT YOU OWE | Creditor Name other than this credit union | present balance | monthly pymt |
|---|---|---|---|
| Closed end | St. Paul Croatian FCU #50 | $327,136.74 | $2,415.49 |

| WHAT YOU OWN | Property location | Market value |
|---|---|---|
| share account 07765000 | main share | 10.75 |

The "Other Information" section is the same as above, as are the statements below "Signatures".

5.   Loanliner Application signed by the debtor and dated April 8, 2009[33] with typed amount requested ($624,183.44),  name, account number 04821056, social security number, birth date, address, and marital status.  Also typed  is:

| WHAT YOU OWE | Creditor Name other than this credit union | present balance | monthly pymt |
|---|---|---|---|
| Closed end | St. Paul Croatian FCU # 50 | $460,849.XX[34] | $XX |

---

[32]  Exhibit 33-7 to 33-9.  The St. Paul Official Check issued in connection with this application is dated January 29, 2008.

[33]  Exhibit 33-13 to 33-14.

[34]  The X indicates illegible due to whiteout.

29

| WHAT YOU OWN | Property location | Market value |
|---|---|---|
| share account 08228000 (above something whited out) | main share | 10.92 |

The "Other Information" and statements below "Signatures" are the same.

6.    Loanliner Application, undated,[35] in the name of ZMS signed by the debtor. This information is typed: ZMS is applying for a loan in the amount of $74,395.62 secured by "misc" collateral, account number 08218058, the debtor's social security number, birth date, phone number, and address.

The Employment/Income section is blank.

The "Other Information" is blank.

The statement below "Signatures" is the same.

7.    Loan Application, undated,[36] in the name of the debtor with no amount requested and no collateral listed. There is a typed account number 07765053, social security number, birth date, address, and marital status. The Employment/Other Income section is blank.

This appears on page 2:

| WHAT YOU OWE | Creditor Name other than this credit union | present balance | monthly pymt |
|---|---|---|---|
| Closed end | St. Paul Croatian FCU #50 | $327,136.74 | $2,415.49 |

| WHAT YOU OWN | Property location | Market value |
|---|---|---|
| share account 07765000 | main share | 10.75 |

The "Other Information" is the same as above.

---

[35]  Exhibit 33-16 to 33-17.

[36]  Exhibit 33-7 to 33-8.

The statement below "Signatures" is the same.

The "For Credit Union Use Only" is dated 1/29/08. There are no signatures or approvals.

8.   Loan Application, undated, signed by the debtor[37] with typed name, social security number, account number 04821054, birth date, and marital status, requesting $119,266.34 for "purpose/Collateral Misc."

The Employment /Income section is blank.

| WHAT YOU OWE | Creditor Name other than this credit union | present balance | monthly pymt |
|---|---|---|---|
| Closed end | St. Paul Croatian FCU C/D GLB Comp | $434,467.30 | $3,187.67 |

| WHAT YOU OWN | Property location | Market value |
|---|---|---|
| share account 07765000 | main share | 10.82 |

The " Other Information" is the same as above.

The typed statement below "Signatures" is the same.

The  "For Credit Union Use Only" section is dated April 17, 2008 with no signature or action noted.

9.   Loanliner Application dated July 15, 2008,[38] requesting $480,807.73, signed by the debtor with typed name, Social Security number, account number 06757052, birth date, and marital status.

The Employment/Income section is blank.

 Page 2 has this additional typed information:

---

[37]  Exhibit 33-4 to 33-5.

[38]  Exhibit 30-1 to 30-2.

| WHAT YOU OWE | Creditor Name other than this credit union | present balance | monthly pymt |
|---|---|---|---|
| Closed end | St. Paul Croatian FCU #50 | $432,719.39 | $3,187.67 |

| WHAT YOU OWN | Property location | Market value |
|---|---|---|
| share account 07765000 | main share | 10.87 |

The responses in "Other Information" and the statements below "Signature" are the same as above.

The "For Credit Union Use Only" section is dated July 15, 2008. There are no signatures or approvals.

10.   Loan Application, undated,[39] requesting $74,395.62 for ZMS as borrower, signed by the debtor with typed in name, Social Security number, account number, birth date, home phone, and address.


## 2.  The "Other Information" Section

The applications all have a typed answer "No" to these questions:

2.   Do you currently have any outstanding judgments . . . had property foreclosed upon or repossessed in the last 7 years, or been a party in a lawsuit?

3.   Is your income likely to decline in the next two years?

The Board argues that the debtor materially misrepresented his financial condition in

these applications because in the time frame from 2007 forward he was in fact a party to

---

[39]  Exhibit 33-16 to 33-17.  The St. Paul Official Check ($45,000.00) issued in connection with this application is dated October 21, 2004.  The debtor signed a note with the same date but it is in the amount of $505,667.01.  The Court assumes for the sake of this discussion that the application is from 2004.

32

lawsuits, had judgments against him, and also that Huntington had filed a foreclosure action against the Bratenahl property. Additionally, it argues that the debtor knew his income was declining before 2007.

### a. Other Lawsuits

The Board cross-examined the debtor about a judgment lien it said had been obtained by GLS for taxes. The debtor acknowledged that he borrowed money from St. Paul in 2003 to pay the taxes by explaining to Raguz what he needed the money for, followed by Raguz authorizing the checks made payable to the treasurer.[40] While Raguz testified that he considered the unpaid taxes to be important information, he did not say that he would not have made any of the loans if he had known about them. In fact, he *did* know about the tax situation when he approved the St. Paul loans to pay them, thus showing that the Board did not prove the omission was material. Additionally, given that the debtor disclosed the debts to Raguz and requested funds to cover them, he could not have intended to deceive St. Paul by failing to list them in the applications.

The Board also questioned the debtor about a lawsuit involving an attorney who had represented the debtor in some unidentified matter. There was no evidence that Raguz would not have approved any loan if he had known about it.

As to federal tax liens, the debtor admitted he did not tell St. Paul about liens filed by the IRS in 2004, 2005, and 2010.[41] Because the liens were not placed in evidence, there was no evidence as to exact filing dates, years covered, amounts, and any changes in status of those liens. Raguz did not testify that he would not have made loans to the debtor if he had known

---

[40] *See* exhibit 22-4 to 22-9 which includes St. Paul Official Checks payable to Cuyahoga County Treasurer in 2001, 2003, 2005, and 2007.

[41] The IRS filed another lien in 2011 but that post-dates the takeover by the Board.

about the liens.  The evidence presented did not prove that the failure to list those liens on any particular loan application was a material misrepresentation of fact on which St. Paul relied.

On the foreclosure issue, both Raguz and the debtor referred to a foreclosure action brought by Huntington against the Bratenahl property but without any specific information such as the filing date or resolution.  Again, because Raguz knew about it and still approved loans to the debtor, he could not have relied on the absence of any foreclosure action when making his lending decisions.  And the debtor could not have intended to conceal it since Raguz already knew about it.

### b.  Declining Income

The debtor also answered "No" to the question:  "Is your income likely to decline over the next two years?"  While there are situations where a "yes" answer would clearly be in order,[42] this is not one of them.  Here, the debtor was in a cyclical business and while he may have been wrong in hoping he would get a large contract, there is a difference between optimism that turns out to be unwarranted and a deliberate misrepresentation.  Raguz was well aware of the ups and downs of the machining business and did not testify that he would not have made any of the loans if he had known that the debtor's income was likely to decline.

### c.  Statements

The applications include the statements that the debtor understood St. Paul would rely on the information he provided together with credit reports and that it is a federal crime to willfully provide incomplete or incorrect information on a credit union loan application.  The reliance

---

[42]  For example, if an employed individual intended to retire in the next two years then the answer would be yes.  The same is true if an employed individual knew he had been fired or downsized with the termination coming up in the near future.

34

sentence does not provide evidence of a fraudulent scheme, although it would have been relevant to whether St. Paul's reliance was reasonable if Raguz had in fact relied on anything in the applications. At that point, it would also have been relevant that St. Paul did not draw any credit reports other than one (not in evidence) connected to the earliest loans. As to the federal crime sentence, the debtor has not been charged with or convicted of a federal crime and the acknowledgment that providing bad information is a crime does not prove the existence of a scheme to commit a crime.

### d. The Blanks on the Applications

The applications do not have information in response to these categories: military, previous employer, income, "What you Own" (other than the debtor's share account) and "What you Owe" other than some (but by no means all) of the debtor's obligations to St. Paul. As to "What you Owe," the Board argues that the debtor should have listed the Huntington/ Metropolitan loan plus two car leases from 2007.

As discussed, the evidence showed that St. Paul knew about the Metropolitan loan shortly after it was made in 1996 and yet St. Paul made numerous loans to the debtor in the following years. Since Raguz did not testify that he would not have made any other loans if he had known about it (and in fact could not have testified to that because he plainly knew about it), St. Paul did not prove actual reliance. Again, the debtor could not have intended to deceive St. Paul because St. Paul knew about the Metropolitan position.

The debtor also failed to disclose that he had obligations under two luxury car leases starting in 2007. He testified that the funds for these obligations (apparently including the funds to purchase the cars a few years later) came from closing out a mutual fund and the Board did not establish otherwise. The testimony suggested generally that with respect to these cars, the

35

debtor chose to apply his money to obligations other than those owed to St. Paul.  Raguz did not

testify that if he had known about the lease obligations or the purchases that he would not have

made any of the loans, and there was no other proof that Raguz was relying on the loan

applications at that point.

B.

There are two final points worth examining on the issue of reliance.

First, the face of each application shows unequivocally that the proposed loan would not

be share secured.  Looking for example at the July 15, 2008 application, it states that the debtor

is requesting a loan in the amount of more than $480,000.00 as secured by a share account with a

market value of $10.87.  Any person involved with St. Paul who looked at the face of that

application would see that the loan request plainly fell outside of St. Paul's lending authority

because it was an unsecured loan greater than $5,000.00.  Therefore, even if Raguz's knowledge

is not imputed to St. Paul, St. Paul could not have justifiably or reasonably relied on these

records.

Second,  Raguz testified on direct examination by the Board that at some point before

1997, St. Paul made an open-ended construction loan to the debtor and "until construction was

complete, [St. Paul was] in for it."  He went on to testify that "only the first mortgage application

was important" to St. Paul, and that first transaction "goes back even further than the 1997

mortgage."  This testimony shows that several years before Raguz began his 2001 fraud, and

before he became a rogue agent, he did not consider the statements made in the loan applications

entered into evidence to be material to his lending decisions and he did not rely on them.

The Board did not prove its case under § 523(a)(2)(B).

36

## **CONCLUSION**

The Board did not meet its burden of proof on its complaint.  A separate judgment will be entered reflecting this decision.

Pat E. Morgenstern-Clarren
United States Bankruptcy Judge